We'll hear argument next in Case 16-1011, WesternGeco v. ION Geophysical. Mr. Clement. Mr. Chief Justice, and may it please the Court, Congress enacted Section 271F to address this Court's decision in Deep South and to prohibit a specific domestic act of infringement with foreseeable foreign consequences. Congress targeted a specific domestic act, the supply of components from the United States, with a particular intent, that the components be combined abroad in a way that if it happened in the United States would constitute infringement. Congress provided a cause of action for the domestic infringement and provided a damages remedy that guaranteed the victim of the infringement damages adequate to compensate for the infringement. The plain text of the Patent Procedure 171F infringement, an entitlement to adequate damages, including lost profits, and the presumption against extraterritoriality, raises no obstacle to that common-sense result. There's no case of this Court that applies the presumption to a damages provision, and there's no case of this Court that applies the presumption in a case of domestic injury caused by domestic consequence or conduct. Ginsburg. There's one feature of this. I mean, it's what Congress in 271F wanted the infringer to be liable, and that's no doubt about that. But all of the activity occurs, not only does the activity occur abroad, sweeping the high seas, but the one who is causing the injury is not the infringer, it's the customer of the infringer. Do we have another situation like that where you can collect from the infringer on the basis of activity by the customer? We do, Justice Ginsburg. The general rule in a domestic context is that you can sue the party who's guilty of contributory infringement and get lost profits for what they did, the foreseeable consequences of what they did, even if that's primarily damages that are caused by their downstream direct infringer. So I think it's helpful, actually, to think about if this whole case happened on Lake Michigan instead of on the high seas, we could sue ION, and only ION, not its customers who practiced the patent on Lake Michigan, and we could recover our lost profits damages. Now, it's true that in the domestic case, the party's ION's customers who were practicing the patent on Lake Michigan were the infringers, and that's one difference. But that's exactly the difference that Congress intended with Section 271F. They specifically created a form of either contributory or inducement liability, understanding that what was being induced was the combination of components outside the United States in a way that would constitute infringement in the United States. Now, I do think it's important to recognize, though, that what is the infringing conduct is what ION does in the United States. What the foreign combiners of the components do on the high seas is not infringement of a U.S. patent at all, which is why I think the presumption against extraterritoriality is really a misfit here. And you have to resort to the general principle, which is in U.S. law, if somebody's injured domestically by domestic conduct, there's no rule that says that in order to calculate the compensatory damages to make them whole, if you have to include in your calculations some foreign thing, there's no rule against that. If I run over a French citizen on my way to court this morning, I can't say, well, I don't have to pay your hospital bills if they're incurred in France, because that would be foreign, and the presumption against extraterritoriality. Mr. Clement, though, the difference I wonder, and I don't know, but I wonder might be this, that as Justice Ginsburg indicated under 271F, fine, you get royalties because it's as if the bits were manufactured here. But you don't have a monopoly, a lawful monopoly, to use this technology abroad. That doesn't belong to you. That's you get lost profits because of a third party's use entirely abroad. That, the lost profits aspect of the damages is the bit that concerns me. And the difference with the common law rule, for example, might be because of the patent law's territorial limits. I don't think so, Justice Gorsuch. And here's how I'd respond, which is we're not collecting damages for the combination itself. What we're doing is we are collecting damages for the foreseeable consequences of the domestic act of infringement. Well, let's just segregate out again the royalties. Put those aside, okay? Can I — Just focus on the profits for me, okay? Okay. And they arise from a third party's use over which you have no lawful monopoly. Your patent doesn't run to the high seas. And so your uses aren't protected there. So help me out with that portion of the damages alone. Sure. The reason that we can collect those damages, even though that conduct is not proscribed by a U.S. patent, is because it is the reasonably foreseeable result of domestic infringement. And so it's no different from what this Court faced in Dowagiac and Gould's two-century-old cases, where what happened if — I see skepticism spreading. All right. Well, here's the degree of my skepticism. I have yet to see a case from this Court, at least, where even under 271A, where the manufacturer entirely takes place here, third-party uses abroad give rise to lost profit damages. With all due respect, Your Honor, that's Gould's. In Gould's, the Canadian sales are allowed as part of the compensation for the domestic — In passing, the Court doesn't even address the issue. We use the word Canadian. That's all we've got. But in Dowagiac, when somebody comes into court and says, I can collect my damages against the Canadian wholesaler because of Gould's, this Court says, not so fast, because you're suing a wholesaler who did nothing in the United States, nothing infringing, and they specifically say that Gould's is different because they're the party, the patent holder sued the right party, the party who made the article in the United States and then was guilty of infringement. If I could get to your point about reasonable royalty, though, I think it's very important to show why that's not a way out here. And my friend's concession on page 35 of his brief that you can take into account the expected foreign use in calculating the rate for the royalty is a very damaging concession, because reasonable royalties are not some alternative to damages adequate to compensate for the infringement. This is not like the copyright context where statutory damages are an alternative to actual damages. Reasonable royalties are just a way of calculating adequate damages. Indeed, they're the preferred method when you have a patent holder who voluntarily licenses the technology to third parties. Then you say, okay, you voluntarily licensed it for 20 cents the bit, that's what we're going to impose as the reasonable royalty to compensate you for the infringement. Breyer. All that will happen, imagine you have the converse case. I mean, if we can have a law like this, so can every other country. Now, an American firm makes a part in some other country. And that happens more and more. They have laboratories all over the world. They make a part. They bring it back here. It doesn't violate the patent law of our country, not at all. They sue it or they sell it all over the place. And suddenly, a foreign patent holder in, say, Switzerland, takes this American company and obtains enormous profits on the basis of the sales in the United States where those sales do not violate American law. I mean, suppose ten countries do this. I try to think about that, and I see chaos or confusion. And at that point, I think part of comedy is what happens if everybody does it. And then I become uncertain about whether there's no place for our concern with what happens when we apply American law abroad, with effects abroad. A couple of points, Justice Breyer. First of all, this has been the rule for basically a hundred years. I've read the cases, and I've read the both sides, and I think you have an excellent case, and they also point out that it's simply a different situation or it's a passing thing, and they did it as a — you've read those two. Okay. So I — you get a plus for that, in my mind, and — but not a total plus, because they get a plus, too. All right. So I accept the argument, but I think I know the argument. Is there anything else? The other thing is — I mean, I would say, you know, I get a couple of pluses, because this has also been the rule — this is — but this has also been the rule in the copyright context, and the world hasn't ended in the copyright context. And I think the key is — here's the key, which is, in all of these cases, what you need to have before you can have any of this liability is a determination by the legislature that some domestic act of infringement is sufficiently serious, that we're going to provide full compensation, even if that has some foreseeable inquiries abroad. And if that creates some situation where some country has a very idiosyncratic view of what constitutes infringement, then maybe government's — I mean, we cover, for example, computer programs. The Europeans don't. I mean, there are different views all over the world. Now, what's bothering me are not the cases, but I can't find that they are in your favor 100 percent. So let's assume that I'm right, that they're not clearly on your side. They're maybe open. What's bothering me is the practical problem that I brought up before of what happens in respect to third-party behavior where they are not violating the law and damages are here, are calculated on the basis of that. What happens if 10 countries do that, if 20 countries do that? I see three possible ways of trying to deal with the problem. One way is what they want. Another way is through the notion of proximate cause. This is a D.C. case after Embegram that takes that route. And there may be a third route. I don't know. I'm posing a practical problem and asking you what, if anything, you want to respond with. I want to respond with two things, Your Honor. First of all is, if I understand the concern to be double damages, I think there are ways to do that. No, it's not double damages. It is the chaos that would ensue if 10 countries have the same rule that you are advocating. With all due respect, there would be no chaos. And that is my principal response. And we would have seen chaos in some context if this were really a problem. And the reason we don't see chaos is because every country, in order for there to be the domestic act of infringement, has to say, look, there's something about this that we really don't want to happen in the United States. And if it happens in the United States, we want to provide damages that make the victim whole. And I think it's a little odd to think of every country doing this because my friend on the other side concedes that you can have an injunctive remedy to prohibit this kind of domestic supply. And if you got the injunctive remedy, it wouldn't happen at all. These foreign combinations would not have happened. And so the principle of damages that's been around in the common law forever and hasn't caused international friction is there's no special rule when somebody injures somebody domestically that says you can't possibly look at any foreign evidence in order to evaluate what would it take to put the party back in the position they were. I mean, at some level, this case is pretty simple. Because of ION's domestic act of infringement, my client has $90 million less in its wallet in Houston than it otherwise would have if they had obeyed the law. And there's nothing in the presumption of extraterritoriality or concerns about comedy, I do think it is telling, that unlike Epigram, unlike Kiobel, unlike many of this, unlike Morrison, unlike many of these Court's cases, there are no foreign governments filing briefs here telling you, boy, would this be a problem if this happens. And I think that's, A, because it's not a problem, and in some ways, I mean, it would be more of a problem if the rule were the other way. I think you would have more comedy. I mean, if you were to tell me that if I hit the French ambassador with my car in Philadelphia, that I pay less in damages than I otherwise would because he's French and he's probably going to have his medical bills paid by a French hospital, I would say, I don't think the French are going to be very pleased about that. I think they would think, no, there was a domestic injury here, and you compensate it, and you take the victim the way you find it, which is the other problem with ION's proposition here. At times in their brief, they seem to say, if only my client had a different business model, then maybe we could collect our lost profit damages. I hear that, but to the extent we're talking about the injury here and the poor French ambassador, I get that we're supposed to treat the manufacturer as if it took place here, but how do we pretend that the use on the high seas took place in Lake Michigan? That's where I'm struggling, and I could still use your help. The high seas and Lake Michigan are just not the same to me. Well, two things, Your Honor. One is, I think Congress made it about as clear as it could in 271F that it wanted you to treat the infringement on the high seas as if it took place on Lake Michigan. The second thing I would say, though, is it just doesn't matter whether some action by third parties that exacerbates damage is independently lawful or unlawful. I mean, if in hitting the French ambassador, there is then an ambulance service that takes the French ambassador to the most expensive hospital. Help me out with just the language of the statute. You say it's obvious from the language of the statute. What would you point me to? What's your best textual argument to show me that the use on the high seas is to be treated as if it took place in Lake Michigan? Because the violator of 271F is liable for either contributory or inducing infringement whether it's F1 or F2 if they induce a combination that if the combination occurred in the United States would violate the patent laws here. So as the Court said in Limelight, you effectively have a contributory constructive infringement. You're supposed to treat that foreign infringement even though, for reasons of comedy, we're not making the foreign combination itself unlawful. We're supposed to treat the domestic infringer just like they induced a domestic act of infringement. Of course, it doesn't stop there. I mean, if you look at 281, which is the analog of the cause of action issue at RJR, it says for the infringement. If you look at the 284, the provision my friend wants you to look at and nothing else, it says damage is adequate to compensate for the infringement. There's no principle. Ginsburg. What about proximate cause? Wouldn't you have to establish at least that the reason that you had the sales that you lost to the foreign, whatever the people who sweep the high seas, that you would have gotten those contracts if they didn't? Absolutely. We have to satisfy proximate cause. It provides sufficient protection here. It's one way in which I think 271A and 271F infringement is different, because in the mine run case of 271F infringement, it's going to be very easy to show damages that are reasonably foreseeable from the foreign combination, because in order to be liable at all, you have to intend or induce that very foreign combination, if I could reserve my time. Thank you, counsel. Mr. Tripp. Mr. Chief Justice, and may it please the Court, I just have a few points I'd like to make and follow up to that. Of course, we're asking the Court to reject the categorical rule that a patentee can never be awarded damages like these. The Patent Act provides for damages that are adequate to compensate for the infringement, not damages that leave the victim worse off than it would have been if the infringement had never occurred. If I could turn to the comedy point and the international relations point that there were questions about, we're here as the United States, and we are supporting petitioner. The rule that we're advocating of full compensation is already the rule that applies basically everywhere else in U.S. law, in tort, in contract, in copyright, that this Court previously assumed applied in patent law as well, and it hasn't given rise to any significant foreign relations problems in any of those areas, and we don't think that there's any reason to believe that it would here. And I think one important piece of that, and one of the ways this is different from actually regulating the conduct on the high seas, is that if U.S. law was actually regulating the third parties on the high seas, you'd have a different set of defendants. The customers who actually did these surveys, they would be here right now before the Court, and they're not. The only people who don't do that are the third parties. Breyer. Maybe this is an easy case, but what's in the back of my mind, I reverse the idea. See, France has this law that you want here, right? Joe Smith goes to France one day, and he makes a tiny particle, which it turns out violates somebody else's French patent. He ships it back to the United States, where it forms a very small part of a very large and valuable gizmo. And all of a sudden, we discover that he's paying the entire profit of the entire gizmo industry to some French company that had a small patent on a small part. Now, all I have to do is generalize from that, and I think, my God, we have a lot of problems here. Now, there should be some principle in law that cuts that off, so my horrible example becomes just what you think it is, a horrible example with no practical bite. And I'm looking for that principle. So I think there's two pieces to that. I think one is that F is, I think, narrower than you're describing in your hypothetical. It doesn't go that far. It reaches conduct that is basically tantamount to actually just making the thing in the United States and then exporting it. It only reaches the supply of all or a substantial portion of the components or a component that is especially designed and has no other purpose other than for use in the invention. And of course, you need to do it with intent. And then the other principle that cuts off, and I recognize the intuition that there may be situations where it seems like the damages are running too far afield from the wrongful conduct that happened in either in the United States or in France in the case of the DC Circuit, but it's not the case. All that we're saying is the right way to approach that problem is with the doctrines of causation and fact and proximate cause that are tailor-made to answer those kinds of questions. Breyer. DC Circuit did that with Enver Graham follow-up in a case which you may not have read. Tell me if you haven't read it. I'll stop. I'm not sure if I have or not. They're using proximate cause to try to deal with this. Does that ring a bell? Forget it. So we think, like, as in an ordinary tort case, in the French tourist hypothetical, in order for her to prove, obtain recovery of lost wages, she needs to prove that the lost wages were the proximate cause, were proximately caused by the underlying tort. But her ability to recover those wages does not depend on whether she would have earned them in Florida or in France, because that is totally irrelevant to the question at the damages stage, which is how big an award does the court need to give to the victim to compensate her, to get her back into the position that she would have been if that tort had never occurred? Sotomayor, you do have to prove, don't you, that this company would have, in fact, made that sale abroad. What happens in a situation where you need a license from a foreign government and there is no evidence that you will necessarily get that license? Well, I think that's too attenuated. It may well be, and I think that gets to an important point, which actually, in patent cases, it's quite difficult to prove even causation in fact for lost profits. If you look at the instructions in this case on even just on causation in fact, they're in the J.A. from. I have. Yeah. I mean, this is quite detailed, and so you have that, and then you have the proximate cause overlay on top of it. I think the other place that I think is helpful to look at this is Professor Smith does a nice job of walking through the doctrine both of causation in fact and proximate cause in the Federal Circuit when dealing with problems that are analogous to these. These are a robust check, but more than anything, what we're saying is that the right way to approach it is with that, through that lens and not through this ham-handed rule that basically as soon as you get across the international border, the causal chain is automatically severed no matter what, no matter how clear the causal link is. That rule, frankly, just doesn't make any sense, and we're asking the Court to reject it. Kagan. May I ask about your theory for getting to that result, which is different from Mr. Clement's theories? And there are quite a number of theories over on that side of the table, and some seem to emphasize 271F and how that came to be and what its particular terms are. Some seem to emphasize that this is a damages provision that we're talking about. Why did you pick the one you picked, and why do you think it's better than the one Mr. Mr. Clement picked, if you still do? Yeah, we absolutely do. We're asking the rule affirmatively to adopt this rule as a matter of Section 284, the general damages provision that applies all throughout the Patent Act. It applies basically everywhere in American law. It should apply basically everywhere in the Patent Act as well, and not just in the rare cases that come up under 271F. I think one piece of that is that really the point of F is to treat the supply of components for assembly abroad the same way as just making it here and then exporting it. But that's an A case, and we think the rule of damages should be the same in both of them. And then I think in terms of our theory, I think our principal submission is that once you get to compensatory damages, right, you have a plaintiff that is standing in front of the court and has already proven its case under U.S. law. It's proven that it's been wronged by the defendant. Right? And then all the court is trying to do is to compensate the victim, to get the victim back into the position that it would have been in if that legal wrong had never occurred. And we think the focus of that inquiry of compensatory damages, that's always domestic, because the victim is just standing right there in front of the U.S. court. Roberts, just to follow up on this, would you agree that the other alternative creates a potential incongruity, because if we were to rely on 271F, we might be in a situation where we're permitting greater damages for someone who only partially manufactured, only partially completed the patent infringement in this country, as compared to someone under A who did the entire act here? Yes, I think that's right. And I think actually the sort of the quintessential, the easiest case are these A cases that was ghouled, as this Court understood it, in Duagiac, which is that there was a manufacturer here followed by a sale abroad, right, a manufacturer for export I think is the easiest example of this. We use it in our brief as the ACME and copycat example. But of course, it could also arise in F cases. And I agree with Petitioner that it's particularly likely to arise in F cases, because every F case has this intent element where you're intending that it will be combined abroad. That happens in some A cases, but not in all of them. Mr. Clement has another theory, which just says the presumption against territoriality doesn't apply at all to damages provisions. Is there a real difference between that and what you're saying? I mean, can you imagine a damages provision where you would say, yes, the presumption against territoriality applies, and this is an extraterritorial application? So I don't think there's a significant difference between the two. We're talking about compensatory damages here. And I think all that we're saying is I think you could look at it either way. You would basically get to the same place, either say that it's inapplicable or apply it and just say that it doesn't change the result. So it's not something special about this damages provision. You're saying as to any damages provision. I think our rule would apply to any general compensatory damages provision. I've not been able to think of any situation where the focus of compensatory damages would be doing anything other than compensating the victim. And we think that is always going to involve a domestic application of the statute. You could come at that and just say that it's inapplicable in that context. I think it basically gets the same results. We wouldn't have a problem with that. What is the domestic injury? I mean, the domestic legal wrong here is the infringement. The legal wrong, yes. But this is what makes this case difficult, because there's such a gap between the legal injury, which is ephemeral, and the practical injury, which occurs completely abroad. Yes. So I think two responses to that. So first, the patent is a property right, and we often think of the invasion of a property right as being something significant, even if it doesn't have additional tangible harm. But also, more fundamentally, it's quite common to hold a tortfeasor responsible for the harm that it causes when it sets into motion a series of events by which the victim will be hurt, even if they're not hurt at the time. So in the French tourist hypothetical that we've been discussing, imagine that what breaks are broken, and the shop doesn't repair the brakes. They tortuously don't do anything and send her back out on the road with a car with no brakes. Of course, she could recover for her lost wages that were caused by that tort, and it would not matter – if I could just finish and answer the question – and it would not matter that the tort, in a sense, didn't hurt her at the time. It set into motion her injury, and it would be liable for the whole thing. Kennedy, I had one question the Chief Justice agreed I could ask. Suppose the Petitioner had a foreign subsidiary in the Bahamas, and it used that in order to conduct the sweeping operation. So it sells the device to the subsidiary, and the subsidiary then uses it. What result? If the Petitioner, under the facts of the case, was basically selling the item to itself? Yes, as a foreign subsidiary. I think maybe in that case it would have difficulty proving lost profits, because I'm not sure how big a profit it would get in a sale made to itself. But then the facts are the same. The subsidiary loses the job because ION does it itself. I think so long as they could prove causation of fact and proximate cause, that if there's infringement here, they're on the hook for the whole thing. Thank you, Counsel. Mr. Shamlegam. Thank you, Mr. Chief Justice, and may it please the Court. The presumption against extraterritoriality applies with particular force to the Patent Act. And as the government recognized, at least in its brief, the presumption applies independently to remedial provisions as well as substantive ones, because remedial provisions can create a similar risk of conflict with foreign law. Now, in our view, this case involves the extraterritorial application of the remedial provision in the Patent Act, Section 284, which by its terms has no extraterritorial reach. And while the act of infringement here, all of the parties now agree, was conceitedly domestic, our submission is that the damages here were, in fact, foreign. And indeed, Petitioner repeatedly describes those damages as foreign. Kennedy, Well, suppose there were a different business model, and what the Petitioner did was to sell the device to others rather than to conduct the operation itself. And it's about ready to sell to X, a foreign company, and then Ion sells the same device and takes the sale away. Would the Petitioner be entitled to the lost profits from that sale? Yes. The answer would be different in that circumstance, because the situs of the injury in that circumstance would be the United States, at least absent any additional  In our view, that hypothetical, Justice Kennedy, is basically the fact pattern of Gould's. And there is an established body of law for determining the situs of the sale of a product. And where you are exporting a product from the United States to a foreign country, at least arguably the situs of the sale is the United States. But this case But isn't the situs of the contract here? You have the contract to conduct the sweep. So there is, importantly, no evidence in the record to that effect. In fact, if you take a look at page 41A of the Petition Appendix, the Federal Circuit says that there is no contention that the service contracts were entered into in the United States. The only thing that you have domestically here, and we all agree that this is true, is the initial act of infringement. And indeed, there is an immediate factual injury that takes place at the point of infringement. The patentee at that point could potentially lose sales of a component if the patentee in fact sold a competing version of the component. That is not the fact pattern here. And there is also the loss of royalties at that point, and that's where the reasonable royalty remedy comes in, to compensate that immediate factual injury. Sotomayor, I'm sorry. I didn't think damages were awarded for a hypothetical. They are awarded for what you lose. And since this company didn't sell its products, it only used them, why should it only get the value of a royalty, since that's not its business? Its business was to sell products, to sell its services, your point, abroad or anywhere in the world where it could, and it wasn't going to ship the part. It wasn't going to permit someone to get a royalty, to pay a royalty. Justice Sotomayor, Petitioner in fact did get a reasonable royalty to the tune of $22 million, which compensates for the act of infringement. That is to say, the initial factual injury from supplying the infringing component from the United States. And that is hypothetical only in the sense that the way a reasonable royalty is calculated, because obviously there was no license and no actual royalty, looks at a hypothetical negotiation. It looks at the negotiation that the patentee and the infringer would have conducted for a license for what turns out to be the act of infringement. Sotomayor, if the jury wasn't permitted to find lost profits, because then the royalty might be something different. Well, in fact, in this case, the jury awarded both.  The only thing that the court recognizes is the traditional default remedy to provide for full compensation. But I do want to address very briefly Petitioner's suggestion in the reply brief and in oral argument that somehow the recognition that the calculation of the royalty could take into account expected foreign use is somehow contrary to our fundamental submission concerning the lost profits damages here. I would refer the Court to Judge Toronto's very thoughtful opinion in the Carnegie-Mellon case on this point. That's the opinion that we cite on the page of the brief that Mr. Clement cited. But I think that in calculating the reasonable royalty, you naturally look to the commercial value of the component that's being supplied from the United States. And engaging in that but-for analysis, of course, one of the things that makes the component lucrative is the fact that ION's customers would value it for its subsequent use. But there, you're not taking into account actual foreign use. You're taking into account the expected foreign use as a way of determining the commercial value of the component. Kennedy, it seems to me that you're confining the right of the Petitioner to decide how it's going to use its own patent. Isn't it up to the patent owner to decide how it's going to capitalize on its patent? The right that is conferred by Section 271F, Justice Kennedy, is a limited right. We agree with Petitioner and the government that 271F was enacted to fill a gap, to essentially overrule this Court's holding in Deep South. But Congress, in doing that, acted in a restrained and limited fashion, consistent with the traditional territorial scope of the patent laws. As this Court recognized in its opinion in Microsoft, Congress acted narrowly to regulate only the active supply from the United States. This might be a different case if Congress had acted more broadly, if Congress had prohibited the foreign combination, or if Congress had amended Section 284 to make broader damages available. But it's important, I think, to keep in mind that Deep South itself didn't involve this type of damages. If you go back and look at the Court's opinion in Deep South, it is clear that Latrim, the patent holder in that case, was seeking an injunction, and it was also seeking lost profits from the lost sales of deveining equipment. But it was not the case that Congress had prohibited the foreign combination. Wouldn't that be the end of the case? Would you still argue that you have to analyze whether the damages provision applies extraterritorially? Well, I think you would, Justice Alito, for the reasons given in your opinion for the Court in RGR Nabisco. In other words, the analysis doesn't end simply because the underlying substantive provision has extraterritorial reach. You do have to go on and conduct an independent analysis of the remedial provision. Now, I think there would be a question about whether the remedial provision, say, sufficiently incorporates the substantive provision such that the remedial provision should be read to reach extraterritorially as well. That was the debate between the majority and the dissent in RGR Nabisco. Alito, there are differences between this case in RGR Nabisco, which I won't go into. But if you have a liability provision that says there is liability for acts that are committed abroad, what sense does it make to say, well, although Congress thinks there should be liability for these acts committed abroad, we have to analyze the remedial provision separately to see whether they wanted any remedy for these acts that are committed abroad? I do think, Justice Alito, that that was an aspect of the scheme at issue in RICO, insofar as in the first part of the Court's opinion, the Court essentially construed section 1962 to reach extraterritorially because certain predicate acts reached extraterritorially. But I do, if you'll allow me to say briefly why it makes sense, and forget about RGR Nabisco for a minute. Why does that make any sense whatsoever? Well, I think that that actually illustrates why this is an easier case than RGR Nabisco. Because what really doesn't make any sense is to conclude that Congress, in regulating only domestic substantive conduct, intended to make foreign damages available as well. And again, in Deep South, this sort of lost profits damages for downstream foreign use was certainly not at issue. Latrim was not seeking to obtain lost profits for the use of deveining equipment. At most, they were seeking lost profits for the lost sales. But with your leave, let me say just one thing about RGR Nabisco, having been told to forget it. I do want to address just one aspect of it, which is the effort to distinguish it by Petitioner in its reply brief. I think Petitioner attempts to draw a distinction between a provision that merely creates a private right of action on the one hand and a damages provision on the other. But as you will recall, in the latter part of the Court's opinion, the court addressed section 1964C, that provision both creates the private right of action and provides for treble damages. And in the Court's discussion of the risk to comity from that provision, the Court discussed not only the fact that you would be creating a private right of action in contexts where foreign governments might not do likewise, but also cited the risk of treble damages. And although there were no amicus briefs in that case, and indeed the European community was a plaintiff in that case, the Court looked back to EMPAGRAN and the proposition that damages provisions, no less than substantive provisions, can give rise to comity concerns. What this Court --- Breyer, that's where I'm having trouble to be actually, to be specific. I can imagine a problem if a large British or French or Swiss company, which makes items sold all over the world, farms out through a branch in North Carolina and makes a tiny part, which it turns out infringes someone else's American patent. And as a result for that, of that, that French or British or Spanish company must pay to that North Carolina firm its profits from billions of dollars of sales across the world. Now, that's not just hypothetical, because an amicus brief cites to us the Marvel case where that really happened. Okay? I can see how that would, in fact, upset foreign countries a lot, because after all, it wasn't even a violation of any foreign patent law. And I can imagine them having similar statutes, which then cause more problems. And that's all in your favor. Yeah. But there is a principle of law that should deal with that, and it's called proximate cause. And that's why I brought up the Empegram case below. They didn't seem, your opponents here did not seem very willing to embrace it. But why doesn't that work? I mean, the problem is one of proximate cause and knowing where to cut it off. And take comedy into account when you apply proximate cause. Don't have an absolute rule. I thought that would be a fallback position for them. So I have several responses to the various aspects of your question. So let me attempt at least four of them, if I can get them out. The first is that while there is a substantial cleavage between Petitioner and the government, I think that if you look at Petitioner's reply brief in particular, it is clear that Petitioner, like the government, thinks that the same rule should apply to Section 271F as to Section 271A. And indeed, if you look at the first ten pages of the reply brief in this argument and excursus about legal injury, the implication would be the same in the 271A context. So to the extent that you cite perhaps a simpler hypothetical in the 271A context, the rule, I think, would have to be the same. And that's why this case is so important. I think, second, your hypothetical earlier was exactly on point. At page 49 of our brief, we give the example of computer software. And as this Court will be aware from the Alice case, there are very real limitations under American law on the patentability of computer software, but other countries such as Japan have a different rule. And so you could have the very same comedy concern that you laid out 20 minutes ago, where you have a foreign country that say because an American company engages in testing in that country, seeks to impose liability for the downstream production of the same product or downstream foreign uses. Ginsburg. But the liability is imposed on a U.S. entity. There's nothing in this picture that regulates anything that occurs abroad. The question is the damages that flow from domestic conduct, not regulation of conduct elsewhere. I mean, to be fair, Justice Ginsburg, I think that what Petitioner is trying to do in this case is effectively to hold us secondarily liable for what would be or what might not be an act of foreign direct infringement. But I think that the concern that this case presents is exactly the concern that Your Honor stated in the opinion for the Court in the Microsoft case, namely, in the Court's own words, converting a single act of supply from the United States into a springboard for what would effectively be worldwide damages. And the Court was citing the brief filed by my learned friend Mr. Clement on behalf of the United States when it said that. That is exactly what is going on here. And the last point I wanted to make in response to your point, Justice Breyer, is the one thing that we haven't heard anything about in any of Petitioner's filings or at oral argument is the fact that Petitioner and its many, many corporate affiliates hold patents in numerous countries around the world. And that is the remedy in this circumstance where what you're talking about is a downstream foreign use or downstream foreign infringement. And, yes, this case arises in the context of the high seas, but as we point out, and as the amicus brief on behalf of the technology industry points out as well, even in the high seas context, you do have a remedy. You can go to the countries where the ships are flagged and prosecute your patents. And as we point out in our brief, Petitioner and its affiliates have patents in all of these countries. Now, I will say that those countries could reach different judgments. In fact, and this is not in the briefs, but I think this is established on the facts of this case, Petitioner's corporate affiliates sought patents elsewhere, they sought patents from the European community, and they actually abandoned the patent that is the equivalent to the primary patent at issue in this case, the 520 patent. And I just think that that reflects the fact that there could be different judgments in different countries. And what Petitioner is really trying to do in this case is precisely what this Court ought to be concerned about. It's attempting to convert an American court, here the Eastern District of Texas, into a one-stop shop for worldwide damages. Kennedy, your position is that the Petitioner is not entitled to full compensation for its injury. That's your position. Petitioner is not entitled to compensation for foreign damages. In other words — Which is the full compensation for its injury. Your whole position is that this Petitioner is not entitled to full compensation for his injury, yes or no? Yes, as a consequence of the application of the presumption against extraterritoriality. And I really do think that this Court established in RJR Nabisco that provisions that afford relief are no different from substantive provisions, jurisdictional provisions, the other types of provisions to which this Court has applied the presumption. Now, I will say, Justice Kennedy, that our submission here is a modest one. I think you can have reassurance that a rule in our favor in this case is not going to create problems for other statutes, and it may leave the door open for damages of the sort we were discussing earlier, damages of the type that were at issue in the United States abroad. Our test is quite simple in determining whether damages are foreign or domestic. You should look to the situs of the factual injury, and you should also look to whether there is subsequent substantial foreign conduct after the act of infringement that gives rise to the injury. And this case is a very straightforward case on the facts to apply that principle, because everything relevant after the initial act of infringement took place abroad. What Petitioner is trying to obtain here is lost profits damages for losing out on contracts to perform entirely foreign surveys. And that's because the law is applied under the so-called predicate act doctrine. A copyright owner can get damages flowing from the exploitation abroad of domestic acts of infringement. Isn't this an application to the patent field of the same doctrine? Yes and no, Justice Ginsburg. In the copyright context, the reason why you can obtain profits for things that take place abroad is because the copyright law makes infringer's profits available. And as Judge Hand explained in the original opinion on this issue, infringer's profits are an equitable remedy. They are a form of disgorgement, and they rely on the legal fiction that you impose a constructive trust on infringing articles, so that whatever happens to those articles, you have a constructive trust on the profits as well. In 1946, Congress amended the predecessor to Section 284 to eliminate that form of profit, to eliminate infringer's profits. And what you can't get, even under the Copyright Act, is the sort of lost profits that are at issue here, the lost profits of the copyright holder. And I would refer this Court to Judge O'Scanlan's opinion for the Ninth Circuit in the Los Angeles News Service case, which draws this distinction and makes that distinction clear. Again, we come back to the sort of fundamental proposition that this Court has taught in RJR Nabisco that you have to apply the presumption to remedial provisions. There is no indication on the face of Section 284 that it provides for extraterritorial damages. All it provides, as Justice Kennedy pointed out, is that you're allowed to obtain damages adequate to compensate for the infringement. That language, while broad on its terms, does not overcome the presumption against extraterritoriality. And so then you have to proceed to the second step. And again, as this Court laid out in RJR Nabisco, at the second step what you do is you look at the focus of the relevant provision, the focus of Section 284 is damages, and you determine whether the damages are foreign or domestic, no different from what the Court did at the second step in RJR Nabisco, which was to determine whether the factual injury, because that statute was worded in terms of injury, is foreign or domestic. And again, in this case, it is very easy to conceive of why the damages are foreign, because there really are two distinct factual injuries here. And since we're talking about car crashes this morning, let me give you an example. If, for instance, I was driving to the court this morning, I was driving over the Roosevelt Bridge, and I crashed into somebody on a motorcycle, and that individual was concussed, the individual then got off the motorcycle and wandered down the bridge, perhaps across the Potomac and across the State line into the District of Columbia, and then got hit by another car. You would say that that person had two injuries. The person had the immediate injury, the concussion, and then had the downstream injury, having, say, their foot run over by another driver. And here, our argument is that the downstream injury is entirely foreign, and again, critically, it relies on the intervening conduct of third parties that would constitute an act of direct infringement. Suppose that the ships in question were all Norwegian ships, at least one of them was a Norway-flagged ship, and assume that Norway had coterminous patent laws to the United States. In this case, Norway would have the ability to impose liability for direct infringement on our customers, the ones who engaged in not just the combination, but the downstream use, and Norway would be able to go after us under its equivalence to Section 271B and 271C. Kennedy, I'll think about your hypo, but it seems to me as if you got back in the car and then hit him again when he went in Virginia. Well, critically That would be more like what happened in this case. We did nothing further, Justice Kennedy. Keep in mind that Section 271F regulates only the act of supply, and indeed, there is no further requirement under Section 271F that the combination actually occur. I heard my friend, Mr. Clement, suggest at one point in his argument that Section 271F has as an element some additional act of inducement. He referred to whether the parties induced a combination abroad. All that the relevant provision here, 271F2, does is to regulate the supply with an intent that a combination occur. Indeed, in this case, as to a percentage of the digifens at issue, there was no ultimate subsequent combination. And so, again, all that we're saying, and I think that this is a submission that flows directly from the language of Section 271F, is all Congress did was to regulate the domestic act of supply consistent with the traditionally territorial nature of the patent laws, and so all you get is damages for that act of supply, for the initial act of supply. Kagan. What struck me about your hypo is that it's a classic law school proximate cause hypo. I mean, that's what that hypo is, and it suggests that if there's a problem here, it's a problem about where you draw the causal line. It's not a problem about some categorical extraterritoriality rule. So I do want to address that, Justice Kagan. I think that in my hypothetical, I'm willing to concede that for purposes of proximate causation and going back to Paul's graph and all of those wonderful cases, that I could be held liable for both of those injuries. And to be sure, this analysis is not entirely disconnected from causation, because, as I indicated earlier, the fact that there is subsequent foreign conduct matters to the test. What makes this case different from the earlier French ambassador hypothetical is that the injury is immediate. It may very well be that you need to have further treatment, but there is not subsequent conduct. I will say you could. I do want to address any suggestion that causation is somehow the solution here by making a couple of points. The first is that with regard to proximate causation, the Federal Circuit has adopted a quite expansive test which requires only mere foreseeability. I would refer the Court to an en banc opinion called Wright-Hite, which sets out that test. There is no proximate causation argument in this case. Professor Yelderman in his amicus brief suggests that this is an easy case for proximate causation. So I don't know that proximate causation, at least under the existing state of the law, unless this Court wants to address that down the road, is going to provide much solace to companies like my client. We do have an argument that Justice Sotomayor adverted to that there is not sufficient but-for causation here. That is an issue that remains to be resolved on remand. And in the event that this Court were to reverse, it certainly should remand to the Federal Circuit so that it can address that issue. Breyer, it doesn't quite answer it, because your client, I don't want to prejudice your client, but it didn't seem to me he was the strongest case for your argument. I mean, the damages here are pretty closely related, I think, but I can easily imagine cases where it's not. And so it's come to the proximate cause. Yes, it's true. If you have a tough proximate cause law, tough, you will stop people from being fully compensated. But the reason you do it is because you're afraid with 92 district courts and juries and so forth, it will get out of control and be a kind of major problem with other countries. The argument the other way, and that's argument for you, say just cut it off. The argument the other way is there are cases that will deserve it, deserve the damages. And that's anything you want to say about that? I would like to say two things about that, Justice Breyer. I mean, the first is that this Court has crossed that bridge, and I would cite this Court's opinion in Empagran for the proposition, the modest proposition, that these sorts of damages awards can create comity concerns. And yes, we're not necessarily dealing with treble damages, though of course enhanced damages are available in patent cases and were in fact awarded here. But what we are dealing with is the very real risk that American juries in patent cases award much bigger damages awards than courts do in other countries. And so even leaving aside the fact that other countries could have totally different substantive patent laws, the risk of runaway jury awards here certainly does present substantial comity concerns. And I think that that is really, you know, fundamentally the reason why the presumption should apply. And I think that the problem that the other side has, which was illustrated by Justice Gorsuch's question, is that it can't point to anything that overcomes the presumption. Sure, Congress was thinking about the possibility of eventual foreign combinations when it enacted Section 271F. But what it didn't do was to attempt to regulate abroad. And this Court in Morrison and RGR has made clear that it is not sufficient to overcome the presumption simply that Congress might have contemplated the possibility of downstream foreign activity. Congress has to give a clear and unmistakable indication of its desire to have extraterritorial reach. It doesn't have to necessarily do so in the language of the statute, though this Court made clear in RGR and Nabisco that it would be a rare case where the presumption is overcome in the absence of explicit statutory language. Sotomayor, did you say earlier that if this censor was manufactured and sold from the United States to someone abroad, you, the infringer, would be liable for that sale, correct? So the yes. All right. So if the infringer knows that the only way that this product is going to be sold is tied to services, why isn't they or why aren't they responsible for that deprivation of the use of the product? Because the damages are foreign. And to be sure, it is an element of liability that you have to have this foreign-oriented intent. Under Section 271F, you have to have an intent that the combination ultimately occur. And we're obviously not disputing before this Court. Sotomayor, the statute by its own is addressing a combination, an intent to have the infringement completed abroad. So we know it applies extraterritoriality in that situation. No. I mean, I think that everyone agrees, and I think that it's a better reading of this Court's opinion in Microsoft, that Section 271F, by its terms, regulates only domestic conduct. The Court did invoke the presumption, but it invoked the presumption to reject a reading that would have given Section 271F effectively extraterritorial effect. But again, just to be clear, I don't think that Petitioner's argument ultimately depends on Section 271F. I think that Petitioner's bottom line is that not only the Federal Circuit's decision in this case, but also its earlier decisions in cases such as power integrations in Carnegie Mellon, a case where a jury awarded $1.17 billion in a reasonable royalty for foreign sales, those decisions would also have to come out the other way. To the extent that Petitioner is relying on Section 271F, that's really window-dressing on its argument, because at bottom, the rule would be the same under Petitioner's interpretation in the 271F or the 271A context. And critically, we all agree that 271F was designed to overturn this Court's decision in Deep South. But the way that Congress did that was to regulate a form of domestic conduct, a form of domestic conduct that as a result of this Court's decision in Deep South did not in and of itself constitute infringement. Congress was certainly not thinking about making available this sort of downstream damages. And to get back to what I think was really sort of driving your question with respect, Justice Sotomayor, the answer to all of this is that Petitioner can go to foreign courts and obtain damages if Petitioner has foreign patent rights and if the law of those respective jurisdictions permits it. And there is a mechanism in place, the WIPO process, that streamlines and makes it in Petitioner's position to obtain those patents and to enforce them abroad. We'd ask that the judgment be affirmed. Thank you. Roberts. Thank you, counsel. Three minutes, Mr. Clement. Clement. Thank you, Mr. Chief Justice. I'd just like to clarify two details and make a couple of points. One detail, my friend mistakenly referred to this case being brought in the Eastern District of Texas. It was in fact brought in the Southern District of Texas where both of these companies are located. It may be a pedantic point, but the Eastern District of Texas has a certain implication to it that I wanted to clarify. The second point is that the — just to be crystal clear, and my friend concedes this in footnote 3 of the red brief, but there were not royalties and lost profits on the same components. The lost profits damages, for those particular components, we got only lost profit damages and the reasonable royalties are only calculated on other units. And I think the concession that you can take into account, the expected foreign use for calculating the royalty really gives the game away, because calculating reasonable royalties is just another counterfactual exercise, the whole point of which is to determine what would my client's position be in the absence of the infringement in the United States. And there's no reason to treat those two situations differently. I'm, of course, happy to win this case on any of the three theories we present in our brief or on the government's theory. I would say, though, that Justice Alito's question is the reason that I do think the better way to resolve this case is to say cleanly, once and for all, the presumption does not apply to damages provisions, because if you walked my friend's theory through and applied the extraterritoriality principles woodenly to a generic damages provision that complemented an expressly extraterritorial liability provision, it would — you'd end up saying, well, this is a foreign application and I guess I can't give damages, even though Congress made this expressly extraterritorial. And that's not a trivial concern. I mean, Congress acted to overturn this Court's decision in EEOC v. Aramico and applied Title VII abroad, and it supplements it with a generic damages provision. It would be really weird if you couldn't get damages for that expressly extraterritorial application. And I think it would be just as weird, with all due respect, to say that you couldn't get compensatory damages for the full amount of the loss in a 271F case because the foreign combination occurred abroad. Congress understood what it was doing. It was imposing liability on a domestic actor for combinations that intentionally took place abroad. And I do think proximate cause is the solution to a lot of the problems, but proximate cause isn't going to be a lot of help to defendants in 271F cases, because if you have to intend or induce the foreign combination, I would say it's reasonably foreseeable. So we think you should reverse the decision below. Thank you. Thank you, counsel. The case is submitted.